**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

JACQUELYN S. McKINNEY,                     )
                                           )
         **Plaintiff,**                    )
                                           )
v.                                         )          **CIVIL ACTION NO. 5:06-00998**
                                           )
MICHAEL J. ASTRUE,                         )
**Commissioner of Social Security,**       )
                                           )
         **Defendant.**                    )

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Claimant's application for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433. This case was referred to the undersigned United States

Magistrate Judge by Standing Order to consider the pleadings and evidence, and to submit Proposed

Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). (Doc.

No. 4.) Presently pending before the Court are the parties' cross-Motions for Judgment on the

Pleadings. (Doc Nos. 9 and 12.)

The Plaintiff, Jacquelyn S. McKinney (hereinafter referred to as "Claimant"), filed an

application for DIB on June 18, 2004, alleging disability as of December 29, 2002, due to a ruptured

disc in her lower back and back pain. (Tr. at 54-56, 70.) The claim was denied initially and upon

reconsideration. (Tr. at 28-30, 35-37.) On March 4, 2005, Claimant requested a hearing before an

Administrative Law Judge ("ALJ"). (Tr. at 39.) A hearing was held on January 19, 2006, before the

Honorable Arthur L. Conover. (Tr. at 250-78.) On March 24, 2006, the ALJ issued a decision denying

Claimant's claim for benefits. (Tr. at 12-20.) The ALJ's decision became the final decision of the

Commissioner on September 29, 2006, when the Appeals Council denied Claimant's request for

review. (Tr. at 5-8.) On November 27, 2006, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (2004). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 404.1520(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2004). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical

shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 14.) Under the second inquiry, the ALJ found that Claimant suffered from degenerative disc disease, which the ALJ found was a severe impairment. (Tr. at 14.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or medically equal the level of severity of any listing in Appendix 1. (Tr. at 15-16.) The ALJ then found that Claimant had a residual functional capacity to perform light work, with the following limitations:

> [C]laimant has the residual functional capacity to lift or carry 20 pounds occasionally and 10 pounds frequently. She can never climb ladders, ropes, or scaffolds. The claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to vibration. Due to pain the claimant is limited to simple work where extended concentration and attention to detail is not required.

(Tr. at 16.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 18.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a cashier, sales clerk, and cleaning worker at the light exertional level, and as a cashier and telephone interviewer at the sedentary exertional level. (Tr. at 19.) On this basis, benefits were denied. (Tr. at 19-20.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined

5

as:

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be somewhat
> less than a preponderance. If there is evidence to justify a refusal to direct a verdict
> were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640,

642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the

Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch,

495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals that the decision of the Commissioner is supported by

substantial evidence.

Claimant's Background

Claimant was born on October 27, 1961, and was 44 years old at the time of the administrative

hearing. (Tr. at 18, 54, 255.) Claimant had a high school education. (Tr. at 18, 75, 260.) In the past,

she worked as a house parent. (Tr. at 18, 71, 156, 274.)

The Medical Record

The Court has considered all evidence of record, including the medical evidence and will

discuss it below as it relates to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence

because the ALJ erred in (1) assessing Claimant's residual functional capacity ("RFC"), (2) not

discussing the side effects of Claimant's prescription medications, and (3) assessing Claimant's pain

6

and credibility. (Doc. No. 9 at 4-12.) The Commissioner asserts that these arguments are without merit and that the ALJ's decision is supported by substantial evidence. (Def.'s Br. at 8-22.)

1. **The ALJ's Residual Functional Capacity Assessment**.

Claimant first argues that the ALJ erred in assessing her RFC when he relied on the statement of her treating physician, William W. Lemley, D.O., that Claimant was capable of performing "some sort of sedentary work" to find that Claimant was able to perform the exertional demands of sedentary or light work. (Doc. No. 9 at 3-8.) Claimant asserts that she is unable to perform the demands of the full range of light exertional work, and therefore, pursuant to SSR 83-10 and SSR 83-12, the ALJ erred in not reducing her RFC to sedentary work. (Id. at 5-7.) In particular, Claimant asserts that the ALJ failed to consider her non-exertional impairments and limitations, including, but not limited to, depression and pain. (Id. at 7.) She asserts that the ALJ improperly referenced in his decision the absence of mental health treatment when Claimant was unable to pay for such treatment. (Id.) Claimant further asserts that the ALJ should have ordered a consultative psychological examination to explore her depression, and at the very least, should have ordered an MMPI report. (Id.)

The Commissioner asserts that the ALJ properly discounted Dr. Lemley's limitation to sedentary work as it was not supported by his treatment notes and the other evidence of record. (Doc. No. 12 at 10-11.) Regarding Claimant's depression, the Commissioner asserts that although the ALJ noted in his decision that she did not seek mental health treatment due to an inability to pay, she told the ALJ that Workers' Compensation paid her medical bills. (Id. at 16.) Additionally, the Commissioner notes that the record does not demonstrate that Claimant sought the need to seek free treatment or emergency room services for her mental problem. (Id.) He also states that Claimant was never referred for mental health treatment due to an emotional problem. (Id.) The ALJ followed the special technique for evaluating her depression and considered the psychological evaluation of

Ms. Reynolds. (Id. at 16-18.) The Commissioner asserts that the ALJ properly discounted Ms. Reynolds' opinions as they were inconsistent with her own notes. (Id. at 17.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2002).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

8

**A. <u>Physical Pain</u>**.

As previously noted, the ALJ in the instant decision determined that Claimant had the severe impairment of degenerative disc disease. (Tr. at 14.) After reviewing and considering the evidence of record, the ALJ concluded that Claimant retained the RFC to perform light work which is simple and involves only occasional postural activities and no climbing ladders, ropes, or scaffolds. (Tr. at 16.) In determining the functional limitations caused by Claimant's physical impairments, the ALJ considered the opinions of the state agency physicians, Uma Reddy, M.D., and Marcel Lambrechts, M.D., who opined that Claimant was capable of performing work at the medium level of exertion. (Tr. at 18, 168-75.) Drs. Reddy and Lambrechts further opined that Claimant's physical limitations were mild, and therefore, she was occasionally limited in climbing stairs, ramps, ladders, ropes, and scaffolds, and was frequently limited in performing the postural activities of balancing, stooping, kneeling, crouching, and crawling. (Id.) The ALJ gave Claimant the benefit of the doubt and rejected the State agency physicians' opinions and limited Claimant to performing light exertional work. (Tr. at 18.)

The ALJ also considered the opinion of Claimant's treating physician, Dr. Lemley. (Tr. at 18.) Regarding Dr. Lemley's opinion that Claimant was not disabled as of January 17, 2003, the ALJ stated:

> Dr. Lemley noted on January 17, 2003, that the claimant asked about the possibility of applying for disability. Dr. Lemley indicated that he told the claimant he would not consider her to be completely disabled as there should be some form of sedentary work she would be able to do. (Exhibit 7F, p5). The undersigned gives significant weight to the opinion by Dr. Lemley that the claimant is not disabled, but rejects the indication that she was limited to sedentary exertion. The treatment notes by Dr. Lemley support the conclusion that the claimant is not that limited. On March 12, 2003, the claimant reported that she had only flare ups "from time to time" of low back muscle spasm. Dr. Lemley diagnosed chronic lumbosacral strain; chronic pain syndrome; and somatic dysfunction thoracic, lumbar (Exhibit 7F, p4). A treatment note dated April 19, 2004, reveals that the claimant exhibited significant pain behavior in getting up and out of

9

a chair, but Dr. Lemley noted that her seated supine straight leg raising was negative. He indicated that the claimant could heel and toe walk without apparent weakness. In fact the claimant reported to Dr. Lemley that she had a series of chiropractic treatment that seemed to help her but then workers' compensation refused any further treatment. The claimant also noted that her pain was occasionally letting up but was never totally resolved (Exhibit 7F, p3).

(Tr. at 17.) In rejecting Dr. Lemley's opinion that Claimant was limited to sedentary exertion, it is clear that the ALJ found such statement inconsistent with Dr. Lemley's treatment notes. The record reveals that Claimant injured her lower back on February 16, 2001, when she tripped and fell over a table at work. (Tr. at 133, 144-45.) The earliest treatment note of record from Dr. Lemley is dated January 28, 2002. (Tr. at 162.) On that day, Claimant reported that her low back pain was worse than when she was first examined by Dr. Lemley and that the pain radiated to her right lower extremity. (Id.) On exam, Dr. Lemley noted that Claimant was very slow getting on and off the exam table due to back pain and that she exhibited some tenderness over the right SI joint. (Id.) Dr. Lemley diagnosed chronic lumbosacral strain; chronic pain syndrome; and somatic dysfunction pelvis, sacrum, and lumbar. (Id.) He performed osteopathic manipulative therapy ("OMT") and prescribed a pain reliever, Ultracet, and a muscle relaxer, Zanaflex. (Id.) On February 11, 2002, Dr. Lemley noted that Claimant was working long hours, which seemed to aggravate her low back pain. (Tr. at 161.) On exam, he again noted her difficulty in getting on/off the exam table and tenderness, as well as decreased range of motion of her right SI joint. (Id.) Dr. Lemley continued the same diagnoses and treatment. (Id.)

Claimant reported on March 28, 2002, that she felt some improvement with a decrease in the severity of her low back pain. (Tr. at 159.) At that time she was undergoing physical therapy, which seemed to help her back condition. (Tr. at 134-44, 159.) Dr. Lemley noted that she had a positive seated straight leg raise and continued tenderness. (Id.) On April 29, 2002, Claimant reported that she was feeling better and had a decrease in her low back pain. (Tr. at 158.) At that time, she was working

10

12-hour shifts and planned to increase to 17-hour shifts, as tolerated. (Id.) On exam, she had some stiffness and was slow getting out of the chair and had some tenderness and myofascial restriction. (Id.) On May 24, 2002, Dr. Lemley noted that Claimant was doing fairly well and was working 15-hour shifts. (Tr. at 157.) He further noted that she was coping well with her pain, but exhibited continued difficulty going up and down stairs. (Id.) Claimant reported on July 8, 2002, that she had a flare up of her low back pain when she went swimming in June. (Tr. at 156.) Claimant was not taking any medications for her back condition at that time, though she had prescriptions for Ultracet and Zanaflex. (Id.) On exam, Dr. Lemley noted that she was stiff and had difficulty arising from the chair and maneuvering on and off the exam table. (Id.) She presented with tenderness and moderate myospasm from L3-5 on the right, but seated straight leg raising testing was negative. (Id.) Dr. Lemley administered OMT, as he had at each exam mentioned above, with good response, and instructed her to resume taking Zanaflex. (Id.) Her condition had not changed by July 26, 2002. (Tr. at 155.)

On October 3, 2002, Claimant reported that her back felt as if it was "going out" more frequently, and occurred when she tried to sleep. (Tr. at 151.) Dr. Lemley noted that Claimant was very slow going from seated to supine position and exhibited myospasm and decreased right SI motion. (Id.) He continued the same diagnoses, including somatic dysfunction thoracic, lumbar, sacral, and pelvis, and continued her same medications. (Id.) Claimant reported increased low back pain and a "catching" sensation on November 14, 2002, but had a negative seated straight leg raise test. (Tr. at 150.) On January 17, 2003, there was no change in Claimant's condition, though she indicated that she had stopped working on December 11, 2002. (Tr. at 149.) Dr. Lemley noted that Claimant "was asking about the possibility of her applying for disability and at this point in time I told her I would not consider her to be completely disabled as there should be some form of sedentary work she would be able to do." (Id.)

Claimant reported on March 12, 2003, that her condition was about the same with continued flare ups of low back muscle spasms. (Tr. at 148.) On May 3, 2003, an MRI Scan of Claimant's lumbar spine revealed disc herniation or protrusion at L5-S1 on the right with significant degenerative disc disease at L5-S1 and to a lesser extent at L4-5. (Tr. at 235.) An x-ray of her cervical spine revealed degenerative disc disease at C5-6 and C6-7. (Tr. at 234.)

On April 19, 2004, Claimant reported that her low back pain occasionally was letting up but never disappeared completely. (Tr. at 147.) She noted that at times, the pain made it difficult for her to walk. (Id.) On exam, Dr. Lemley noted that Claimant exhibited significant pain behavior getting on and off the exam table. (Id.) She presented with a negative seated straight leg raise, and was able to heel and toe walk without apparent weakness. (Id.)

On July 9, 2004, Claimant was examined by Z. Comeaux, D.O., another physician in the clinic in which Dr. Lemley worked. (Tr. at 145.) Claimant reported increased back pain which radiated to her left lower extremity in addition to radiation to her right lower extremity. (Id.) On exam, Dr. Comeaux noted that Claimant had significant antalgic behavior getting on and off the exam table and was not able to do a seated or standing flexion test because it was uncomfortable for her to stand or sit erect. (Id.) Seated straight leg raise testing was negative and was able to  heel and toe walk stiffly, though she was able to use the muscles associated with those segments. (Id.) She exhibited voluntary delay of guarding to palpation of the spine bilaterally. (Id.) Shortly after the exam, Claimant asked Dr. Comeaux if we would give her pain medication and he prescribed her Ultram 50mg. (Tr. at 145-46) In his treatment note, Dr. Comeaux stated:

> Because of the complex issues with this evaluation including the lack of follow through at our clinic the inconsistencies on examination and the variable effort put into the exam, it is hard for me to have a clear conclusion. . . . I also discussed the fact that on the chart there was a social security disability form and I indicated that I really

would not be able to promote her cause in disability since I was new to her. There was inconsistencies on findings and I hadn't been working with her before.

(Tr. at 145.) It is this statement, combined with Dr. Lemley's statement of January 17, 2003, as summarized by the ALJ, with which Claimant takes issue.

As the Commissioner points out, Claimant mistakenly combines the two statements in his brief. (Doc. No. 9 at 4.) Dr. Comeaux declined to comment on her disability in part due to her newness to him; Dr. Lemley had treated Claimant since January, 2002, and therefore, she was not new to him. Dr. Lemley opined that Claimant was not "completely disabled as there should be some form of sedentary work she would be able to do." (Tr. at 149.) As noted above, the ALJ gave significant weight to Dr. Lemley's opinion that Claimant was not disabled. (Tr. at 17.) This opinion was made by her treating physician, and was consistent with his treatment notes and the opinions of the state agency physicians, in that they opined she was capable of performing medium exertional work. (Id.) The ALJ rejected Dr. Lemley's opinion however, to the extent that he restricted her to sedentary work. (Id.) The ALJ noted that prior and subsequent to Dr. Lemley's opinion, Claimant reported only occasional flare ups of low back muscle spasm, and although she exhibited significant pain behavior in getting out of a chair, her seated straight leg raising was negative and she was able to heel and toe walk without apparent weakness. (Tr. at 17, 147-48.) Moreover, Claimant continued to work full time, which consisted of working up to 15 hours each day, until December 11, 2002. (Tr. at 149, 158, 161-62.)

Following Dr. Comeaux's examination of Claimant, she continued to seek treatment from Dr. Lemley from October 15, 2004, through September 15, 2005. (Tr. at 226-33.) On October 15, 2004, she reported that she had good days and bad days with her low back pain and that when her back "catches," it did not respond well to Ultracet. (Tr. at 18, 233.) On exam she had a negative seated straight leg raising and only mild restriction in sacral flexion. (Id.) Claimant reported on November 18,

2004, that she experienced constant and dull low back pain, with an occasional "catching" sensation. (Tr. at 18, 232.) Dr. Lemley noted that she exhibited much less pain behavior, had a negative seated straight leg raising, and decreased right SI motion. (Id.) He continued the same diagnoses and treatment, but noted that her chronic pain syndrome was accompanied by pain magnification. (Id.) He also prescribed Lortab for pain that was not controlled by Ultracet. (Id.) On January 24, 2005, Claimant reported that coughing had increased her low back pain, which radiated to her left lower extremity. (Tr. at 231.) Dr. Lemley noted on exam that Claimant exhibited significant pain behavior, was slow arising from a chair, and was very slow in changing positions on the treatment table. (Id.) Nevertheless, she had a negative seated straight leg raising test and had no significant myospasm in the lumbar area, though she had exquisite tenderness. (Id.)

On March 7, 2005, Claimant reported that Ultracet generally relieved her low back pain and that Lortab relieved what Ultracet did not. (Tr. at 230.) However, on May 15, 2005, she reported that Ultracet did not provide relief and that she had to take two Lortabs to obtain relief. (Tr. at 229.) She again exhibited difficulty getting on and off the exam table, a negative straight leg raising in the seated position, and exquisite tenderness. (Id.) On July 11, 2005, her low back condition essentially was unchanged, though she exhibited moderate tenderness in the thoracic region, with some pain exaggeration. (Tr. at 18, 228.) Nevertheless, she had a negative seated straight leg raising, full motor strength, and was able to heel and toe walk without difficulty. (Id.) Claimant reported increased low back pain radiating to her left hip on September 15, 2005. (Tr. at 226.) On exam, Dr. Lemley noted that her left hip was restricted in abduction with exquisite tenderpoint, but negative seated straight leg raising. (Id.) Claimant was examined by Dr. Comeaux again on December 15, 2005, at which time she reported increased left hip pain. (Tr. at 18, 225.) A neurological exam essentially was unremarkable; Claimant had negative seated straight leg raising and was able to heel and toe walk without weakness.

14

(<u>Id.</u>)

Claimant further asserts that the ALJ failed to consider a motor vehicle accident, which occurred subsequent to her alleged disabling work injury on June 27, 2005. (Doc. No. 9 at 4.) However, this accident resulted in neck pain and did not exacerbate or aggravate her low back pain. (Tr. at 228, 267.) She reported to Dr. Lemley on July 11, 2005, that the she experienced immediate pain following the vehicles' impact, but specifically denied any flare up of her low back pain. (Tr. at 18, 228.) She was treated in the emergency room, where she was given Flexeril and Lortab for the pain. (<u>Id.</u>) Dr. Lemley noted on July 11, that Claimant was in no acute distress and exhibited some reduced cervical motion. (<u>Id.</u>) He diagnosed acute cervical strain and continued her OMT and conservative medication treatment. (<u>Id.</u>) On July 22, 2005, Claimant reported that she felt much better with decreased neck pain, though she reported an occasional weakness in both arms. (Tr. at 18, 227.) On exam, Dr. Lemley noted that she exhibited much less pain behavior, moderate myofascial tenderpoints in the upper thoracic area, and mild myofascial restriction of the left cervical C5-6, without exquisite tenderness. (<u>Id.</u>)

Based on the foregoing, the undersigned finds that the ALJ's decision not to give significant weight to Dr. Lemley's limitation of sedentary work is supported by substantial evidence of record. As the ALJ noted, the treatment notes of Drs. Lemley and Comeaux reflected only occasional flare ups of low back pain and that primarily, she presented with negative seated straight leg raising and was able to walk without evidence of any weakness. The treatment notes, therefore, did not demonstrate any additional limitations for which the ALJ should have accommodated in his RFC assessment.

**B. <u>Depression</u>**.

To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe. 20 C.F.R. §§ 404.1520(c); 416.920(c) (2006); <u>see also</u> 20 C.F.R. §§ 404.1521(a);

416.921(a) (2006); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119

(1987) (recognizing change in severity standard). A severe impairment is one "which significantly

limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c);

416.920(c) (2006); <u>see also</u>, 20 C.F.R. §§ 404.1521(a); 416.921(a) (2006). "Basic work activities"

refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b); 416.921(b)

(2006). Examples of basic work activities under those sections are:

> (1)  Physical functions such as walking, standing, sitting, lifting,
> pushing, pulling, reaching, carrying, or handling;
> (2)  Capacities for seeing, hearing, and speaking;
> (3)  Understanding, carrying out, and remembering simple
> instructions;
> (4)  Use of judgment;
> (5)  Responding appropriately to supervision, co-workers and usual
> work situations;  and
> (6)  Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b); 416.921(b) (2006). Claimants are responsible for providing medical

evidence demonstrating that they have severe impairment(s) during the time they claim they are

disabled. <u>See</u> 20 C.F.R. §§ 404.1512(c); 416.912(c).

At step two of the special technique, the ALJ acknowledged Claimant's complaints of

depression and determined that Claimant did not provide medical evidence which demonstrated a

severe mental impairment. (Tr. at 15.) The ALJ summarized and considered the only psychological

consultation of record, which was conducted by Mareda Reynolds, M.A., on January 16, 2006,[2] which

was three days prior to Claimant's administrative hearing. (Tr. at 15, 236-46.) Claimant reported to

Ms. Reynolds that she became depressed after she injured her back in February, 2001, and that she had

since experienced low mood, irritability, and low frustration tolerance. (Tr. at 238.) She indicated that

---

[2] Claimant was referred to Ms. Reynolds by her attorney for a psychological evaluation to assess her current functioning with regard to her eligibility for DIB. (Tr. at 238.)

she became easily overwhelmed and worried about her family's financial difficulties. (Id.) She further reported that she had difficulty sleeping, a loss of interest in previously enjoyable activities, a decreased libido, and difficulty with attention, concentration, and memory. (Id.) On mental status exam, Ms. Reynolds noted that Claimant easily established rapport, was cooperative and forthcoming with information, was alert and oriented, exhibited appropriate social interaction and eye contact, and exhibited adequate speech. (Id.) She noted that Claimant's mood ranged from dysphoric to euthymic, and that though her affect was mildly constricted, her affect was appropriate to expressed ideas. (Id.) Claimant presented no circumstantiality, flight of ideas, tangentiality, word salad, or neologisms; had adequate insight and judgment; denied homicidal or suicidal ideation; and had normal immediate and recent memory. (Id.) Psychological testing revealed a verbal IQ of 97, a performance IQ of 98, and a full scale IQ of 98 on the WAIS-III. (Tr. at 15, 241.) The WRAT-3 revealed that Claimant could read and spell at the high school level and performed arithmetic at the sixth grade level. (Tr. at 15, 242.) Ms. Reynolds diagnosed depressive disorder NOS and opined that her prognosis was fair. (Id.)

Ms. Reynolds completed a form Mental Assessment of Ability to do Work-Related Activities (Mental), on which she opined that Claimant had marked limitations in her ability to deal with work stress and demonstrate reliability. (Tr. at 15, 245-46.) She opined that Claimant had moderate limitations in her ability to deal with the public, interact with supervisors, function independently, maintain attention or concentration, behave in an emotionally stable manner, relate predictably in social situations, and understand, remember, and carry out complex job instructions. (Id.) The remaining limitations either were slight or none. (Id.)

The other medical evidence of record reveals that on exam by Dr. Timothy R. Deer, M.D., on August 29, 2001, Claimant denied suicidal or homicidal ideation or any other psychiatric complaints. (Tr. at 118.) Dr. Deer found that Claimant was alert and oriented with a pleasant affect. (Id.)

Dr. Crouse noted on November 28, 2001, that Claimant was slightly anxious and that her mood was depressed only mildly. (Tr. at 216.) Dr. Crouse noted however, that Claimant exhibited normal insight and judgment, presented no indication of a thought disorder, was of average intelligence, and was oriented. (Id.) He diagnosed pain disorder associated with both psychological factors and a general medical condition, and assessed a Global Assessment of Functioning ("GAF") score of 60.[3] Dr. Jackson found on November 28, 2001, that Claimant's mental status was normal. (Tr. at 210.)

The ALJ rejected the assessments and opinions of Ms. Reynolds, finding that they were not supported by the objective findings of record. (Tr. at 15.) He determined that Ms. Reynolds'

> extreme limitations [were] not even supported by Ms. Reynolds in the narrative description of her evaluation of the claimant. Ms. Reynolds noted that the claimant's social interaction was appropriate. She indicated that the claimant's concentration and attention were within normal limits. Ms. Reynolds based her opinions on the claimant's subjective complaints, and she is not credible.

(Id.) As noted above, Ms. Reynolds observed on mental status exam that Claimant exhibited appropriate social interaction and reported that she visited with a neighbor daily, yet Ms. Reynolds opined that Claimant was moderately limited in her ability to relate to coworkers, deal with the public, interact with supervisors, behave in an emotionally stable manner, and relate predictably in social situations. Furthermore, on psychological testing, Ms. Reynolds noted that Claimant's scores were valid as she put forth sufficient motivation and effort, that she clearly understood the instructions, and that no sensorimotor deficits interfered with her testing performance. However, she opined that

---

[3] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994). A GAF of 61-70 indicates that the person has "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *Id.*

Claimant was moderately limited in her ability to understand, remember, and carry out complex job instructions. In addition to Ms. Reynolds' observations, the record does not support Ms. Reynolds' extreme limitations.

At steps two and three of the special technique, and in determining the functional limitations caused by Claimant's mental impairments, the ALJ therefore, properly concluded that Claimant had a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration; and that Claimant's depression was not a severe impairment. (Tr. at 15.)

In assessing Claimant's RFC, the ALJ did not specifically discuss any limitations arising from her depression. (Tr. at 16-18.) Nevertheless, the ALJ concluded that Claimant was limited to performing only simple work where extended concentration and attention to detail is not required. (Tr. at 16.) The ALJ stated that his RFC assessment was rendered after carefully considering the entire record. (Id.) Except for difficulties in maintaining attention and concentration, Claimant did not indicate any other limitations resulting from her depression. The ALJ's RFC accommodates these difficulties. Accordingly, the undersigned finds that any error that the ALJ may have committed in not stating specifically in the RFC discussion section of his decision any limitations resulting from Claimant's depression, is harmless. The record does not support any limitations beyond those assessed by the ALJ.

Claimant also takes issue with the ALJ's reference to her lack of mental health treatment or medications because she was unable to afford such treatment. The Commissioner may not deny a claimant benefits on the basis of a failure to seek treatment due to a lack of funds. See Mickles v. Shalala, 29 F.3d 918, 929-30 (4th Cir. 1994); Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986); Social Security Ruling 82-59, 1982 WL 31384, *4. Social Security Ruling 82-59 delineates

19

the circumstances in which the Commissioner must excuse a claimant's failure to follow prescribed

treatment, in part, as follows:

> 4. The *individual is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable.* Although a free or subsidized source of treatment is often available, the claim may be allowed where such treatment is not reasonably available in the local community. All possible resources (e.g., clinics, charitable and public assistance agencies, etc.), must be explored. Contacts with such resources and the claimant's financial circumstances must be documented. Where treatment is not available, the case will be referred to VR.

The procedures mandated in SSR 82-59 however, apply only to "[a]n individual *who would*

*otherwise be found to be under a disability*, but who fails without justifiable cause to follow treatment

prescribed by a treating source which the Social Security Administration (SSA) determines can be

expected to restore the individual's ability to work." In the instant action, the ALJ did not find that

Claimant was otherwise disabled. The medical evidence, combined with the other evidence of record,

including Claimant's self-reports, demonstrated that Claimant was not under a disability. Therefore,

the procedures outlined in SSR 82-59 are inapposite to the case at hand.

Notwithstanding the inapplicability of SSR 82-59, the undersigned concurs with the

Commissioner and finds that Claimant has not demonstrated that she sought but was denied mental

health treatment due to a lack of funds. Admittedly, Dr. Lemley requested and was denied

authorization from Workers' Compensation for a psychological evaluation. (Tr. at 231-32.) However,

the record does not indicate that Claimant's mental health condition reached the severity where she

was required to seek emergency treatment for which she was denied because she could not afford it,

or that she sought other forms of mental health treatment and was denied due to the lack of funds.

Furthermore, the objective evidence of record, including Claimant's reported activities, belied any

assertions of functional limitations resulting from any mental impairment beyond those limitations

assessed by the ALJ. Accordingly, the undersigned finds that the ALJ did not rely improperly on

Claimant's inability to pay for mental health treatment in finding that her mental impairments neither were severe nor functionally limited her ability to work.

Finally, Claimant argues that the ALJ erred in not developing the record, and should have ordered a consultative psychological evaluation, or at the very least an MMPI. The Court agrees with the Commissioner and finds Claimant's argument on this point unavailing. In Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986), the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The Court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence. Id.

It is nevertheless Claimant's responsibility to prove to the Commissioner that she is disabled. 20 C.F.R. §§ 404.1512(a), 416.912(a) (2006) (stating that "in general, you have to prove to us that you are blind or disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s).") Thus, the claimant is responsible for providing medical evidence to the Commissioner showing that she has an impairment. Id. §§ 404.1512(c), 416.912(c). The Regulations provide that: "You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled." §§ 404.1512 (c); 416.912(c)(2006). In Bowen v. Yuckert, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of

impairments . . . .  If the process ends at step two, the burden of proof never shifts to the Secretary.  . . .  It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. at 146, n. 5; 107 S.Ct. at 2294, n. 5 (1987). Thus, although the ALJ has a duty to develop the record fully and fairly, he is not required to act as the claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a *prima facie* entitlement to benefits.  See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

At the administrative hearing, Claimant's counsel reported that she had requested that either Ms. Reynolds or Dr. Goudy,  perform an MMPI test to rule out or confirm a somatoform disorder, as suggested by Drs. Lemley and Comeaux. (Tr. at 252.) Counsel also indicated that it was acceptable to her "to have DDS to do it with whomever they use." (Tr. at 253.) The ALJ however, advised counsel that she could have either Ms. Reynolds or Dr. Goudy conduct the test if they were available "in the next short period of time." (Id.) At the end of the hearing, the ALJ left the record open for counsel to submit an MMPI report but counsel reported to the ALJ on February 8, 2006, that there was no further evidence to submit. (Tr. at 12.) Given that counsel did not submit the report, Claimant believes that the ALJ should have ordered the test or sent her for a consultative psychological evaluation.

Regarding the ALJ's duty to refer a claimant for a consultative examination, 20 C.F.R. §§ 404.1517 and 416.917 (2006) provide that "[i]f your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests." There is no

22

evidence to suggest that Claimant's mental impairments were severe prior to her date last insured. In the absence of Claimant's identification of further medical records or ways in which the ALJ could have developed the record, the Court finds that the ALJ did not breach his "duty to investigate the facts and develop the arguments both for and against granting benefits." Sims v. Apfel, 530 U.S. 103, 111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000). The evidence of record regarding Claimant's mental condition was sufficient from which the ALJ could determine Claimant's mental limitations. As such, the ALJ was not required to order a consultative examination or an MMPI, and the undersigned proposes that the presiding District Judge so find.

**2. Side Effects From Medications.**

Second, Claimant alleges that the ALJ erred in not considering the side effects from her prescription medications. (Doc. No. 9 at 9-10.) She asserts that the ALJ acknowledged her medications but failed to consider their effects pursuant to SSR 96-7p. (Id. at 10.) The Commissioner asserts that the ALJ specifically stated in his decision that he considered the side effects of Claimant's medications. (Doc. No. 12 at 14.) He further asserts that a review of the record revealed that Claimant made no on-going complaints of significant medication side-effects to her practitioners, except for heart palpitations resulting from the use of Celebrex. (Id.) The Commissioner notes however, that Celebrex was not regularly prescribed to Claimant. (Id.) Accordingly, the Commissioner asserts that the record does not evidence any functional limitations from her prescription medications, and therefore, the ALJ was not required to address them specifically in his decision. (Id.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (1999); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent

23

to which they affect a claimant's ability to work must be evaluated.  Id. at 595.  When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's  subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative.  Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (1999).  Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . .  Factors relevant to your symptoms, such as pain, which we will consider include:
>
> > (I) Your daily activities;
> >
> > (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> >
> > (iii) Precipitating and aggravating factors;
> >
> > (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> >
> > (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> >
> > (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> >
> > (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (1999). SSR 96-7p repeats the two-step regulatory provisions:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations.  A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

It is evident that Claimant was prescribed and regularly took pain relievers (Ultracet and Lortab) and a muscle relaxer (Zanaflex). At the administrative hearing however, Claimant's counsel

25

reported that due to the drowsiness effect from Lortab, she did not take it when she had to care for her eight-year old son. (Tr. at 254.) In a Personal Pain Questionnaire dated July 7, 2004, Claimant reported that the medications she was prescribed made her sleepy, nauseous, and caused heart palpitations. (Tr. at 89.) She reported therefore, that she took Tylenol for her low back, hip, and leg pain, which sometimes relieved her pain. (Tr. at 85-89.) In her form Disability Report - Appeal, dated October 22, 2004, she reported taking Ultracet and Ambien but did not identify any side effects from these medications, though the form specifically asked her to identify side effects. (Tr. at 101.) Likewise, in another form Disability Report - Appeal, dated April 1, 2005, she did not report any side effects from Lortab, Ultracet, or Ambien.[4] (Tr. at 108.) The record in this matter indicates that Claimant reported to Dr. Timothy R. Deer, M.D., on August 29, 2001, that one of her prescribed medications, Celebrex, was causing chest tightness. (Tr. at 120.) Dr. Deer, therefore, instructed her to discontinue use of Celebrex and to take Zanaflex 2mg instead. (Id.) Dr. Comeaux initially prescribed Celebrex on July 9, 2004, but then changed it to Ultram 50mg after Claimant advised that she experienced heart palpitations with Celebrex. (Tr. at 146.) The medical record does not evidence any other reference to Claimant's reported side effects from any medication, whether obtained by prescription or purchased over-the-counter.

The ALJ noted in his decision the requirements of 20 C.F.R. § 404.1529 and SSR 96-7p in considering the side effects of any medications and indicated that he considered the entire record in this matter. (Tr. at 16.) The ALJ however, did not mention or discuss specifically Claimant's alleged side effects from her medications. The undersigned acknowledges that Lortab may cause drowsiness, and that Claimant reported at one point that she was taking eight to ten Lortabs a day. Nevertheless,

---

[4] The undersigned notes that the two Disability Report - Appeal forms were completed by Claimant's counsel, Jan Dils. (Tr. at 104, 111.)

Claimant never reported to her physicians that Lortab caused drowsiness or requested a different pain reliever. Moreover, despite Claimant's allegations of drowsiness, the record does not contain any functional limitations resulting from the side effects of her medications. Without having established any significant functional limitations resulting from any medications she took, the undersigned finds that any error the ALJ may have committed in not addressing explicitly the side effects from Claimant's medications is harmless. See Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (*citing* Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002)("Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations.")). Claimant did not address the side effects of sleepiness or nauseousness to her physicians and did not address in her brief how she was limited functionally by the alleged side effects. Accordingly, the undersigned finds her argument to be without merit.

**3. The ALJ's Pain & Credibility Assessment.**

Claimant next alleges that the ALJ failed to apply the requirements of SSR 96-7p and 20 C.F.R. § 404.1529 in assessing her pain and credibility. (Doc. No. 9 at 11-12.) She asserts that the ALJ simply noted that Claimant's statements were inconsistent but did not provide any analysis. (Id. at 12.) Claimant further asserts that the ALJ did not consider fully the effects of her repeated back injuries and her psychological problems, and therefore, completely ignored her non-exertional limitations. (Id.) The Commissioner asserts that Claimant's argument is without merit and that substantial evidence supports the ALJ's decision. (Doc. No. 12.)

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 16.) Having resolved all doubts in Claimant's favor, the ALJ acknowledged, with regard to the threshold test, which is outlined above, that Claimant "produced evidence of an impairment that could reasonably be expected to cause the alleged symptoms." (Tr. at

27

16.) Regarding the second step, the ALJ considered the intensity and persistence of Claimant's alleged symptoms and complaints of pain, and the extent to which they affected her ability to work. (Tr. at 16-18.) The ALJ concluded that the Claimant's "statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible." (Tr. at 17.)

The undersigned finds that the ALJ properly considered the factors under 20 C.F.R. § 404.1529(c)(4), in evaluating Claimant's pain and credibility, despite Claimant's assertion to the contrary. The Claimant summarized Claimant's reported wide variety of activities of daily living, which included getting her husband ready for work and her son ready for school every morning, making the bed, doing the dishes, dusting, reading, visiting a neighbor, preparing meals, and having dinner with her family. (Tr. at 17.) She reported that she required assistance getting in and out of the bathtub. (Tr. at 16.) On a weekly basis, Claimant reported sweeping, mopping, and vacuuming; shopping; and driving once or twice each week. (Id.) The ALJ noted that Claimant stayed home ninety percent of the time and did not participate in her son's school activities. (Tr. at 16.) At the administrative hearing, Claimant reported that she used to ride horses two to three times a week but now rides only two to three times a summer and no longer four wheel rides as she once did. (Tr. at 268.) Additionally, she testified that she could walk for only ten to fifteen minutes at a time. (Tr. at 266.) In a form Function Report, dated July 7, 2004, Claimant reported that on a daily basis she bathed, ate, did light housework, took care of her child, watched television, and visited with her neighbor. (Tr. at 77.) She also indicated that she required help shaving her legs because she could not bend down, yet she reported that she picked up objects out of the floor. (Tr. 78-79.)

The ALJ also noted Claimant's complaints of pain in her neck, back, hips, and legs. (Tr. at 645-46.) He noted that she used a TENS unit once or twice a week, had undergone physical therapy, and took Lortab and Ambien. (Tr. at 16.) At the administrative hearing, Claimant also testified that she

28

wore a back brace five or six times a month when her back would "catch." (Tr. at 269.) As discussed above, the ALJ noted that Claimant experienced flare ups of low back pain from time to time and exhibited significant pain behavior in getting out of a chair. (Tr. at 17.) Despite these allegations, her seated straight leg raising was negative and she was able to heel and toe walk without weakness. (Id.) She further indicated that her pain occasionally let up, but was never resolved completely. (Id.) Regarding treatment, the ALJ noted that Claimant treated with Dr. Lemley, and occasionally Dr. Comeaux, and referenced treatment notes from January 17, 2003, through December 15, 2005. (Tr. at 17-18.) He noted that Claimant underwent a series of chiropractic treatments that seemed to help her but that Workers' Compensation refused to pay for further treatment, and that she had undergone physical therapy. (Tr. at 16-17.)

Claimant argues that the ALJ failed to conduct an analysis of her pain and credibility. Rather, she asserts that the ALJ merely referenced statements she made and determined that she was not entirely credible. As noted above, the ALJ discussed the requirements of 20 C.F.R. § 404.1529(c) and followed the procedures set forth in SSR 96-7p. After discussing her activities of daily living, he determined that her activities were inconsistent with her statements that she could not function on a daily basis. (Tr. at 16-18.) He considered her complaints of pain, the medication she took, treatment she received and sought, and the efforts she took to alleviate her pain. (Tr. at 16-18.) The ALJ then weighed her statements against the objective evidence of record and determined that her alleged intensity, duration, and limiting effects were more severe than indicated by the record. (Id.) The undersigned has already determined that Claimant did not specifically discuss the side effects resulting from her medications but that any error therefrom was harmless. Based on the foregoing, the undersigned finds that the ALJ's assessment of Claimant's pain and credibility regarding her physical impairments was in conformity with the Regulations and is supported by substantial evidence.

29

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the District Court confirm and accept the foregoing findings, **DENY** Plaintiff's Motion for Judgment on the Pleadings (Doc. No. 9.), **GRANT** the Commissioner's Motion for Judgment on the Pleadings (Doc. No. 12.), and **DISMISS** this action from the docket of the Court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).  Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

DATE: February 25, 2008.

R. Clarke VanDervort
United States Magistrate Judge

30